**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

**RICHARD ROBERT JOHNSON,**

**Plaintiff,**

**v.**

**DAVID CRIST, Warden, and**
**DR. CHRISTOPHER CEMAN,**

**Defendants.**

---

**Civil No. 00-309 (ADM/SRN)**

**REPORT AND RECOMMENDATION**

Richard Robert Johnson, Minnesota Correctional Facility -- Stillwater, 970 Pickett Street North, Bayport, MN 55003-1490, Plaintiff, pro se.

Matthew J. Hanzel, Geraghty, O'Loughlin & Kenney, 1400 Ecolab University Center, 386 North Wabasha Street, St. Paul, MN 55102-1308, for Defendant Dr. Christopher Ceman.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

Plaintiff Robert Johnson, a prisoner of the State of Minnesota, has brought this action under 42 U.S.C. § 1983, seeking relief for alleged violations of his federal constitutional rights. This Report and Recommendation addresses a motion for summary judgment, pursuant to Fed. R. Civ. P. 56, filed by Defendant Dr. Christopher Ceman, the sole remaining Defendant in this case.[1] The matter has been referred to the undersigned for report and

---

[1] Defendant David Crist's Motion for Summary Judgment was granted by the Honorable Ann D. Montgomery, United States District Court for the District

FILED OCT 25 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

recommendation under 28 U.S.C. § 636 and Local Rule 72.1(c). For the reasons discussed below, it will be recommended that Defendant Ceman's motion for summary judgment be granted.

## I. BACKGROUND[2]

The record shows that Plaintiff has had problems with his left knee since approximately 1984, when, at age 23, he injured his knee during a prison-yard football game. Since then, he has intermittently sought medical attention for his knee from prison health care providers.[3] Plaintiff Johnson's knee injury was examined at St. Cloud Hospital on September 15, 1984. See Exhibit A to the Affidavit of Matthew J. Hanzel (Hanzel Aff.). The attending physician noted that although Plaintiff Johnson had a good deal of pain on examination, there did not appear to be any joint effusion, nor was there a demonstration of instability to varus or valgus stress. Id. The anterior and

---

of Minnesota, in an Order dated March 7, 2001. Plaintiff's appeal of that Order was dismissed for lack of jurisdiction on July 16, 2001, by the United States Court of Appeals for the Eighth Circuit (Doc. No. 124).

[2] The Court's understanding of the background of this case is based primarily on (1) Plaintiff's "Memorandum Of Law In Support Of Complaint And Demand For Jury Trial And Reply Objection [etc.]," (Doc. No. 41); (2) the Affidavit of Maureen Conner, a prison health services administrator, (Doc. No. 72); (3) the "Supplemental Affidavit of Richard Robert Johnson [Plaintiff] With Exhibits," (Doc. No. 79); 4) the Affidavit of Matthew J. Hanzel with attached Exhibits A-D (Doc. No. 98);and the Affidavit of Christopher Ceman, M.D. (Doc. No. 97).

[3] Petitioner was released from prison in the late 1980s, but he returned to prison in 1991, after being convicted of first degree murder. (Affidavit of Sheryl Vezner, [Docket No. 70].)

posterior drawer signs were negative, as was an x-ray of the left knee. Id. Finally, the physician saw no evidence of severe ligamentous injury, but suggested re-evaluation when the pain diminished. Id. Plaintiff Johnson was given a knee immobilizer, and was instructed to elevate his knee, use cold packs, and crutches. Id. The diagnosis was soft tissue injury, left knee, rule out internal derangement. Id.

In 1986, Plaintiff was seen in the orthopedic unit at St. Paul Ramsey Medical Center. See Exhibit B to the Hanzel Aff. The orthopedic surgeon's impression was "chondromalacia patella"[4], with possible meniscal tear, "but symptoms do not warrant arthroscopy." Id. The course of recommended treatment was to continue quad exercises and to lose weight. Id.

In 1995, Plaintiff was transferred to the Minnesota Correctional Facility at Stillwater, Minnesota, (MCF-STW). He was confined there at all times relevant to this lawsuit, and he is still confined there at this time.

In early 1998, Plaintiff began to complain more frequently about his knee, and by March of 1998, MCF-STW physician, Dr. Ramos, ordered that x-rays be taken of Plaintiff's knee. The March 27, 1998, x-ray views of the Plaintiff's left knee revealed a small, old osteochondroma arising from the medial tibial metaphysis. Very minimal degenerative changes were present,

[4] Chondromalacia patellae is defined as a softening of the articular cartilage of the patella. PDR Medical Dictionary, (1st Edition, 1995).

and the radiologist saw no other abnormalities. See Exhibit C to the Hanzel Aff. Thereafter, Plaintiff Johnson was referred to the orthopedic unit at St. Paul Ramsey Medical Center for another evaluation of his knee, which occurred on March 30, 1998. Id. Following his examination of the Plaintiff, orthopedic surgeon Paul Hartleben, M.D. noted the following:

> Patient is a large man weighing in at 350 pounds. He walks without pain. Deep knee squatting does cause some left knee pain with what he describes mostly along the lateral joint line. The left knee shows no evidence of effusion. There is mild medial and lateral joint line tenderness. Patellofemoral joint is asymptomatic. ROM is normal. Ligamentous exam is stable with Lachman's, anterior drawer and collateral stress testing. No evidence of significant meniscal signs are present.
>
> . . . Outside films taken March 1998 show non-weight bearing films with good joint spacc, but there is tibial spine spurring as well as mild early medial and lateral joint spurring. This is all indicative of mild early osteoarthritis.

Exhibit C to the Hanzel Aff. Dr. Hartleben's diagnosis of Plaintiff's condition was: 1. Early mild left knee osteoarthritis. 2. Morbid obesity. Dr. Hartleben wrote:

> At this point, I think [Plaintiff Johnson] is most symptomatic from mild arthritis and morbid obesity. He does not have symptomatic meniscus tear nor does he have significant inflammatory fusion to warrant aggressive intra-articular management. I recommend simply to lose 50-100 lbs. And his knee ought to feel substantially better. Occasional anti-inflammatories are recommended. Should his knee develop a significant effusion, then options would include

> aspiration with Cortisone injection. He may also benefit from arthroscopy in the future, but his is not indicated today . . .

Id. Dr. Hartleben advised Plaintiff to lose weight and avoid playing football, softball and basketball. Id.

On December 23, 1998, approximately nine months after Plaintiff's visit to Dr. Hartleben at St. Paul Ramsey Medical Center, Defendant Dr. Christopher Ceman first saw Plaintiff Johnson. See Exhibit D to the Hanzel Aff. Defendant Ceman is a medical doctor employed by Correctional Medical Services, Inc., a private company that has been retained by the Minnesota Department of Corrections to provide health care services to inmates at MCF-STW. See Affidavit of Christopher Ceman, M.D. Plaintiff came to Dr. Ceman seeking relief for ongoing pain in his left knee, and Dr. Ceman observed "crepitation on motion of the left knee. Full range of motion left knee. No laxity present. Negative drawer sign." Id. Dr. Ceman's impression was "chronic left knee pain secondary to long-standing history of chondromalacia patella," and prescribed Motrin 800 mg qid for one month, stating that if Plaintiff's pain did not improve Dr. Ceman would consider a Cortisone injection. Id.

On January 26, 1999, Plaintiff Johnson returned to Dr. Ceman, and reported that the Motrin had not helped his pain. Id. at p. 5. Dr. Ceman's observations and impressions were the same as in December 1998, and,

because the Motrin had not relieved Plaintiff's pain, Dr. Ceman administered a Cortisone injection. Id. Dr. Ceman noted that he hoped the Cortisone injection would help alleviate Mr. Johnson's pain for six months, and that "losing weight was encouraged." Id.

The record indicates that Dr. Ceman saw Plaintiff Johnson on February 3 and 23, 1999, on March 9, April 22, June 14, August 23 and 27, September 8, October 29, and November 5, 1999, but none of these visits involved complaint about Mr. Johnson's left knee. See Exhibit D, pp. 6-15.

On November 19, 1999, nearly eight months after the Cortisone injection, Plaintiff Johnson returned to see Dr. Ceman complaining of left knee pain, and requesting surgical repair of the knee. Id. at p. 16. That day, Dr. Ceman observed, "[m]assive abdominal obesity, left knee has crepitation upon extension inflection, there is no laxity present. Minimal pain palpation in the medial compartment area. Positive drawers [sic]sign on external and internal rotation of the left tib." Id. Dr. Ceman's impression was long-term chondromalacia patella on the left, with possible internal derangement, aggravated by obesity. Id. Dr. Ceman noted that Plaintiff

> was sent to physical therapy for diagnosis and treatment; he was told to eat 4 small meals a day with a little protein in each meal. Normally [Plaintiff] eats 2 Ramen Noodles at night before he goes to bed, I told him to cut it down to one. He drinks diet-Coke or water. If he's not losing weight on 4 small meals a day, he needs to cut each portion in half. If he's not losing weight when he cuts the portions in half, he

> needs to see me right away because something serious is going on then. Left knee x-ray and then see me in 6 weeks.

Id.

Plaintiff next visited Dr. Ceman for knee pain on December 16, 1999. Exhibit D to the Hanzel Aff. at p. 17. This time Dr. Ceman noted that the November 30, 1999, x-ray had confirmed chondromalacia patella on the left and degenerative joint disease as well, aggravated by massive obesity. Id. In addition, Dr. Ceman wrote that although Plaintiff was going to physical therapy with only minimal relief of the left knee pain, Plaintiff was to continue with physical therapy as per the therapist's recommendations. Id. Dr. Ceman planned to see again Plaintiff six weeks later, and if the physical therapist informed Dr. Ceman that there is nothing more he can do for Plaintiff, then Dr. Ceman planned to possibly recommend another orthopedic evaluation. Id.

Dr. Ceman next saw Plaintiff Johnson on December 30, 1999. See Exhibit D to the Hanzel Aff., p. 18. Dr. Ceman observed:

> Apparently [Plaintiff Johnson] and the therapist are not seeing eye-to-eye. The physical therap[ist]is thinking about putting [Johnson]on no-work status to take the pressure off of his knees because Mr. Johnson is just not losing any weight despite at least the third time now I've told him about four small meals a day and he's still eating three times a day. But once again I reinforced the four small meals a day in hopes that he'll start to lose some weight and take the pressure off of his knees. I asked [Plaintiff Johnson] []to make sure that when he sees Mr. Haugland, the physical therapist, again in about 2 weeks, that I'm

> there and we'll have a conference about his care.

Id. On January 19, 2000, Dr. Ceman met with Plaintiff Johnson and Physical Therapist Darrin Haugland. See Exhibit D to the Hanzel Aff., p. 18. Dr. Ceman's progress notes regarding the meeting read as follows:

> . . . Mr. Johnson's main concern is that if we put restrictions on him at work i.e. no lifting greater than 10 LBS, no stooping or squatting to protect his knees, Mr. Johnson is afraid that he will loose [sic] his job. Starting February 1st, 2000, there is a "no work, no play policy" and he's concerned that he will have to stay in his cell 23 out of 24 hours a day.
> Patient care conference will be arranged and hopefully Maureen Connor will be there or Kathleen Holt, Darrin Haugland, myself, Richard's caseworker and Richard's industry foreman. Hopefully we will be able to work out some type of plan here that will lessen the damage to his knees and allow him to work in some type of capacity.

Id.

Dr. Ceman last treated Plaintiff Johnson for his knee on February 22, 2000, at which time Dr. Ceman observed and noted:

> Massive abdominal obesity. Left knee has crepitation upon extension, flexion, there is no laxity present. Minimal pain palpation in the medial compartment area. Positive Drawer's sign on external and internal rotation of the left tib-fib.
> 1) X-ray confirmed DJD left knee aggravated by 2) Obesity. 3) Hypertension. 4) Asthma. 5) Chemical dependency. 6) Carpal tunnel syndrome bilaterally with right carpal tunnel release on 8/12/99 and left carpal tunnel release on 10/26/99.
> With Heidi Lamers, LPN, in the room as a witness, I asked Mr. Johnson if he's willing to accept the fact that if he continues to work he may end up not being

> able to walk because of the chronic degenerative changes in the left knee aggravated by his obesity and his working. He said he was willing to take the risk but that he would see me in court. Recheck in 1 month. Motrin 800 tid prn aches and pains. The Motrin is refillable prn X 1 year.

Exhibit D to the Hanzel Aff., p. 19.

Plaintiff Johnson was seen for his knee condition by three other physicians throughout the remainder of the year 2000; Dr. S. Anderson on July 11, 200, Dr. Dennis Momah on November 7, 2000, and Dr. Dean Lee on December 12, 2000. See Exhibit D to the Hanzel Aff., pp. 22, 24 and 25. All three of these physicians' impressions, observations, and recommended courses of treatment were virtually identical to those made by Dr. Ceman. Id. In their progress notes of examinations conducted pursuant to Plaintiff's complaints of left knee pain and accompanying requests for: 1) a "tier restriction" at work (Exhibit D, p. 22); and 2) MRI studies of his knee (Exhibit D, pp. 24 and 25), all of these doctors noted how imperative it is that Plaintiff lose weight. Id. Said Dr. Anderson, "[Mr. Johnson's] weight has been un-measurable as he weighs more than #350 LBS and we don't have a scale to measure this. . . . Patient was also admonished to lose at least #100 LBS of weight . . ." Exhibit D to the Hanzel Aff. at p. 22. Dr. Momah recommended that Mr. Johnson "ambulate with a cane and also institute aggressive weight loss . . . I also encourage the patient to continue Motrin. Id. at p. 24. Dr. Lee noted a "long discussion regarding the overall care of these kinds of problems

and the need for him to continue exercises, weight loss, etc., which has been discussed with him by physical therapy on numerous occasions. . . . patient should continue with the usual standard regimens for care such as anti-inflammatories, exercises, weight loss, etc." Id. at p. 25.

The Court notes that Plaintiff and Dr. Ceman disagreed on how to treat the pain in Plaintiff's left knee. Dr. Ceman continued to recommend physical therapy, anti-inflammatory medications, and weight loss. He also prescribed shock absorbing inserts for Plaintiff's shoes, and recommended that Plaintiff should stop working at his prison job. See Affidavit of Maureen Conner, ¶¶ 11-12. Plaintiff contends that further testing of his left knee and even surgery are warranted, and he wishes to continue working without any medical restrictions.

On February 9, 2000, Plaintiff commenced his present lawsuit, seeking relief under 42 U.S.C. § 1983 for alleged violations of his federal constitutional rights. Plaintiff's remaining claims are that Defendant Ceman violated Plaintiff's rights under the Eighth Amendment by deliberately disregarding his medical needs by declining to give him the medical treatment he deems necessary for his injured knee.

## II. DISCUSSION

Defendant Ceman contends, in general, that he is entitled to summary judgment because Plaintiff has failed to establish a genuine issue of

material fact to support an Eighth Amendment deprivation of medical treatment claim. The Court agrees.

### A. Standard of Review

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). The moving party has the initial responsibility of demonstrating that there is no genuine issue of material fact to be decided. Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986). When a motion for summary judgment has been made and supported by the pleadings and affidavits as provided in Rule 56(c), the burden shifts to the party opposing the motion to put forth evidence demonstrating that a trial is required because a disputed issue of material fact exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In satisfying this burden, however, the non-moving party must do more than simply establish doubt as to the material facts. The party opposing summary judgment may not "rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 586, n.11; Krenik v. County of Le Seuer, 47 F.3d 953, 957 (8th Cir. 1995). Fed. R. Civ. P. 56 (e). Pro se pleadings should be given a liberal construction and held to a less stringent standard than attorney drafted pleadings. Haines v. Kerner, 404 U.S. 519, 520-21 (1972). However, the

plaintiff still must present evidence to defeat a properly supported summary judgment motion and may not rely upon conclusory allegations and unsupported assertions. Dunavant v. Moore, 907 F.2d 77, 80 (8th Cir. 1990).

**B. Legal Analysis**

"It has long been established that prison officials violate a prisoner's Eighth Amendment right to be free from cruel and unusual punishment when the officials are deliberately indifferent to the prisoner's serious medical needs." Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995), citing Estelle v. Gamble, 429 U.S. at 104. "A prison official exhibits deliberate indifference when the official actually 'knows of and disregards' a prisoner's serious medical needs." Boyd, supra, quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994).

> "An Eighth Amendment claim that prison officials were deliberately indifferent to the medical needs of inmates involves both an objective and a subjective component. [Citation omitted.] The plaintiffs must demonstrate (1) that they suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs. [Citation omitted.] 'Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.' ' Hudson v. McMillian, 503 U.S. 1, 9,... (1992). '[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge.' Long v. Nix, 86 F.3d 761, 765 (8th Cir.1996). As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Id."

Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997).

Thus, there are several elements to an Eighth Amendment claim brought against a prison official based on an alleged denial of medical care. First, the prisoner must show some specific "objectively serious medical need," i.e., one that is both readily discernible and involves "an excessive risk to the inmate's health." Second, the defendant must have been personally aware of the inmate's particular medical need and its seriousness. Third, the defendant himself must have been deliberately indifferent to such serious medical need. "Deliberate indifference may be demonstrated," for example, "by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment." Dulany, 132 F.3d at 1239.

In this case, there are several fatal flaws in Plaintiff's Eighth Amendment claim against Defendant Ceman. First, Plaintiff Johnson has offered no evidence showing that he has any "objectively serious medical need." "To constitute an objectively serious medical need or a deprivation of that need,... the need or deprivation alleged must be either obvious to the layperson or supported by medical evidence." Aswegan v. Henry, 49 F.3d 461, 464 (8th Cir. 1995). The record in this case certainly shows that Plaintiff has a problem with his left knee, and there is no reason to doubt that he suffers pain as a result of that problem. However, Plaintiff has not demonstrated that he has any genuine need for any specific medical care or treatment beyond that which

has been provided to him. Furthermore, he has offered no evidence suggesting that whatever medical needs he might have are "objectively serious," i.e., that such needs are readily apparent to a layperson or plainly substantiated by his medical records.

Defendant Dr. Ceman attests that additional imaging and surgery were medically unnecessary in Plaintiff's case, and that a non-invasive course of treatment – limited work, radical weight loss program, physical therapy, treatment with anti-inflammatories – was more appropriate, and safer, under the circumstances. See Ceman Aff., ¶ 5. The Plaintiff contends that his injured left knee has deteriorated beyond a point where medication such as Motrin, Cortisone injection, or physical therapy can help alleviate the pain. Plaintiff has therefore demanded further imaging studies and even surgery on his left knee. However, Plaintiff's self-assessment is just that, and is absolutely unsubstantiated by the medical record before this Court. The Plaintiff disagrees with Dr. Ceman's course of treatment, and has deemed a different course necessary. This does not rise to the status of being an objectively serious medical need.

Nor has Plaintiff offered any evidence showing that he suffers from any condition that creates an "excessive risk" to his health.[5] In the absence of

---

[5] Plaintiff broadly contends that his knee problem has caused him to gain weight, which, in turn, has caused him to suffer from unhealthful hypertension. He has offered nothing, however, to support this theory. Indeed, his medical

some evidence demonstrating that Plaintiff has some specific, readily identifiable, "serious medical need," Defendant Ceman cannot be found to have violated Plaintiff's Eighth Amendment rights.

Finally, there is simply no evidence in the record that Defendant Ceman has deliberately disregarded Plaintiff's medical needs. Rather, to the contrary, the record shows that over the course of two years Dr. Ceman attempted, on numerous occasions, to treat Plaintiff's left knee condition by providing medications, shots, physical therapy, x-rays, orthopedic consultations, and medical advice regarding restrictions of work activities, exercise, and drastic weight loss to alleviate pressure on the knee. Dr. Ceman's observations and recommendations for treatment of Plaintiff Robert Johnson's left knee condition are supported by those of Drs. Hartleben, Anderson, Momah and Lee, all of whom have treated Plaintiff for complaints regarding his left knee. Conclusory assertions are not sufficient to withstand a motion for summary judgment. See Roberson v. Bradshaw, 198 F.3d 645, 647 (8th Cir. 1999); Miller v. Solem, 728 F.2d 1020, 1026 (8th Cir.), cert. denied, 469 U.S. 841 (1984).

For the reasons discussed above, the Court concludes that Defendant Ceman's Motion For Summary Judgment must be granted. Plaintiff

---

records strongly suggest that his excess weight has been a substantial cause of his knee problems, rather than the other way around.

has cited no evidence that would allow a jury to conclude that he has any objectively serious medical needs, or that Defendant Ceman deliberately disregarded any such needs. It will therefore be recommended that the action be dismissed with prejudice as to Defendant Christopher Ceman.

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1) Defendant Dr. Christopher Ceman's Motion For Summary Judgment (Doc. No. 95) be **GRANTED,** and this action be dismissed with prejudice as to Defendant Dr. Christopher Ceman.

Dated: October 25, 2001

Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this report and recommendation by filing with the Clerk of Court and serving all parties, within ten days after being served with a copy thereof, written objections which specifically identify the portions of the proposed findings, recommendations or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief with ten days after service thereof. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.